UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PHILIP EDWARDO,

                          Plaintiff,

                -v.-

THE ROMAN CATHOLIC BISHOP OF
PROVIDENCE; ST. ANTHONY'S CHURCH
CORPORATION NORTH PROVIDENCE;
and LOUIS E. GELINEAU,

                          Defendants.

---

21 Civ. 1514 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

The operative complaint in this case depicts a harrowing, years-long campaign of sexual abuse perpetrated on a vulnerable child by his parish priest.  Plaintiff Philip Edwardo recounts that from approximately 1978 to 1984, when he was between 12 and 17 years old, he became ensnared in a cycle of sexual abuse and exploitation at the hands of Father Philip Magaldi, a now-deceased Rhode Island priest.  Invoking the suspended statute of limitations for victims of child sexual abuse under the New York Child Victims Act, Plaintiff brings suit against The Roman Catholic Bishop of Providence ("RCB"), St. Anthony's Church Corporation North Providence ("St. Anthony's"), and retired Bishop Louis E. Gelineau ("Bishop Gelineau," and together with RCB and St. Anthony's, "Defendants") for their roles in enabling Fr. Magaldi's reign of abuse and molestation.

Defendants move to dismiss the Second Amended Complaint on the grounds that: (i) this Court lacks personal jurisdiction over any Defendant, all

of whom are based in Rhode Island; and (ii) Plaintiff's claims are barred by a Rhode Island state court decision dismissing parallel claims brought by Plaintiff against Defendants and others.  Because the Court finds that it lacks personal jurisdiction over Defendants, it grants their motion to dismiss.

**BACKGROUND**[1]

**A.    Factual Background**[2]

**1.    The Parties**

Philip Edwardo is an adult male citizen of the United States, currently residing in Palm Beach County, Florida.  (SAC ¶ 4).  During the relevant time period, Plaintiff was a resident of Rhode Island and was a minor under the age of 18 years old.  (*Id.*).  Plaintiff served as an altar boy and was employed in various capacities at St. Anthony's, a parish of the Roman Catholic Church located in Providence, Rhode Island.  (*Id.* at ¶¶ 1, 5, 23).  Fr. Magaldi was employed as a diocesan priest at St. Anthony's.  (*Id.* at ¶¶ 1, 5, 21).

---

[1]    The facts in this Opinion are drawn from Plaintiff's Second Amended Complaint ("SAC" (Dkt. #30)), the well-pleaded allegations of which are taken as true for purposes of this motion.  *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009).  The Court also considers the exhibits attached to the Declaration of William E. Vita in support of Defendants' motion to dismiss ("Vita Decl., Ex. [ ]" (Dkt. #33)), which exhibits consist primarily of court documents filed in a related action brought by Plaintiff in Rhode Island.

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #35); Plaintiff's opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #38); and Defendants' reply brief as "Def. Reply" (Dkt. #39).

[2]    The instant motion centers on complex issues of personal jurisdiction and claim preclusion.  Because resolution of these issues does not require recitation of the more salacious allegations in the Second Amended Complaint, this Opinion recounts the facts at the level of generality necessary to decide the motion.

Louis Gelineau, a resident of Rhode Island, was formerly the Bishop of Providence and Administrator of the Diocese of Providence. (SAC ¶¶ 6-7). As Bishop during the relevant period, Bishop Gelineau was the highest official representative of the Diocese of Providence. (*Id.* at ¶¶ 7-8). In this role, he governed the diocese, including by exercising legislative, executive, and judicial power. (*Id.* at ¶ 8). Additionally, Bishop Gelineau approved fundraising for St. Anthony's and was responsible for hiring, training, assigning, and supervising diocesan candidates accepted for admission to the priesthood, seminarians, deacons, and priests. (*Id.* at ¶¶ 8-9). He was also tasked with responding to reports of alleged abuse and sexual misconduct against priests within the diocese. (*Id.* at ¶ 9). And his supervisory responsibilities included oversight of St. Anthony's parish, as well as Fr. Magaldi individually. (*Id.* at ¶ 10).

The Roman Catholic Bishop of Providence is organized as a corporation sole under the laws of the State of Rhode Island, with its principal place of business in Providence, Rhode Island. (SAC ¶¶ 11, 12). The RCB is the primary corporate entity through which Bishop Gelineau and the Diocese of Providence conducted their business. (*Id.* at ¶ 14). The RCB's business includes revenue-producing activities, such as soliciting money and charitable contributions to support their operation and services. (*Id.* at ¶ 15). Both Fr. Magaldi and Bishop Gelineau engaged in fundraising activities on behalf of the RCB. (*Id.*). Under the RCB's supervision, the Diocese of Providence hired employees, including Plaintiff and Fr. Magaldi, to work at individual churches within the diocese. (*Id.* at ¶ 16).

St. Anthony's Church Corporation North Providence is a corporation organized under the laws of the State of Rhode Island, with its principal place of business in North Providence, Rhode Island.  (SAC ¶¶ 17-18).  St. Anthony's is a parish within the Diocese of Providence that was operated, managed, and maintained by Bishop Gelineau and the RCB during the relevant period.  (*Id.* at ¶¶ 19, 21).  As the pastor of St. Anthony's, Fr. Magaldi was responsible for the day-to-day operation of that parish, a role that included interacting with altar boys, soliciting funds, maintaining records, and hiring persons to fill various roles within the church.  (*Id.* at ¶ 21).  Plaintiff held various roles at St. Anthony's, including altar boy and sexton.  (*Id.* at ¶ 23).  In his capacity as an employee of St. Anthony's, Plaintiff's responsibilities included cleaning and repairing the church building, working in the rectory, acting as Fr. Magaldi's driver, and assisting Fr. Magaldi with *ad hoc* errands and tasks.  (*Id.*).

### 2.    Plaintiff's Relationship with Fr. Magaldi

Plaintiff was raised in a devout Roman Catholic household, as part of a family that observed and participated in religious traditions through parishes within the Diocese of Providence.  (SAC ¶ 32).  As such, Plaintiff viewed priests with reverence and respect, trusting them to be holy and chaste men who acted in the best interests of their parishioners.  (*Id.*).

Plaintiff's relationship with Fr. Magaldi began at St. Anthony's in or around 1977 or 1978.  (SAC ¶¶ 40-41).  According to Plaintiff, from the outset of their relationship, Fr. Magaldi served as a mentor and confidant, providing Plaintiff with religious instruction and spiritual guidance.  (*Id.*).  Over time, Fr.

4

Magaldi learned of Plaintiff's personal vulnerabilities, which knowledge he later exploited to perpetuate and cover up his sexual abuse of Plaintiff over a period of years. (*Id.* at ¶ 41). As one example, in 1979 or 1980, Fr. Magaldi learned that Plaintiff's mother had a serious drinking problem, which added significant strain to Plaintiff's home life. (*Id.* at ¶ 46). Preying on Plaintiff's difficult familial situation, Fr. Magaldi offered St. Anthony's rectory and church as a refuge for Plaintiff to escape his troubles. (*Id.* at ¶ 47).

The sexual abuse of Plaintiff by Fr. Magaldi began in the spring of 1980. (SAC ¶ 53).[3] After taking Plaintiff to a restaurant for lunch, Fr. Magaldi brought Plaintiff to a spa, where he raped him in a steam room. (*Id.* at ¶ 54). From that point on, Fr. Magaldi's abusive conduct escalated, as did the number of instances of sexual assault. (*Id.* at ¶¶ 56, 59-60). Fr. Magaldi also forced Plaintiff to drink alcohol to induce compliance with his abuse. (*Id.* at ¶¶ 56-58). On one occasion, when Plaintiff told Fr. Magaldi to stop fondling him, Fr. Magaldi threatened to reveal to Plaintiff's father that Plaintiff had consumed alcohol to the point of intoxication — a salient threat, given the issues Plaintiff's mother had with alcohol. (*Id.* at ¶ 61). Plaintiff estimates that between 1978 (when he was 12 years old) and 1984 (when he was 17 years

---

[3]    The Second Amended Complaint contains several allegations of sexual abuse before 1980 committed by priests within the Diocese of Providence against child victims besides Plaintiff. (*See* SAC ¶¶ 34-38). These include allegations that Fr. James M. Silva molested at least seven boys between 1960 and 1980 (*id.* at ¶ 36); Fr. Edmund Micarelli abused at least seven boys — one for seven years — prior to 1962 (*id.* at ¶ 37); and Fr. William C. O'Connell pleaded guilty to sexually abusing three boys between 1965 and 1972 (*id.* at ¶ 38). In addition to the allegations concerning Fr. Magaldi's abuse of Plaintiff, the Second Amended Complaint includes claims that Fr. Magaldi assaulted a 14-year-old boy in the early 1970s. (*Id.* at ¶ 39).

old), he was sexually abused between 100 and 300 times by Fr. Magaldi. (*Id.* at ¶ 64).

### 3. The Trip to New York

In the summer of 1983, Fr. Magaldi took Plaintiff on a trip to New York City, during which he sexually assaulted Plaintiff in the Waldorf-Astoria Hotel. (SAC ¶¶ 70, 81). The purpose of this trip was for Fr. Magaldi to meet with Claus von Bülow, a Danish-born socialite, to discuss the latter's conviction for the attempted murder of his wife. (*Id.* at ¶¶ 66-69).[4] Following von Bülow's conviction, Fr. Magaldi had urged David Marriott — a penitent of Fr. Magaldi's at St. Anthony's — to come forward with ostensibly exculpatory evidence in support of von Bülow. (*Id.* at ¶ 67).[5] When Marriott's credibility came into question, Marriott suggested that Fr. Magaldi could corroborate the information Marriott provided because years earlier he had confided the same information to Fr. Magaldi during confessions at St. Anthony's. (*Id.* at ¶ 68).[6]

---

[4]    As set forth in the Second Amended Complaint, von Bülow was found guilty in 1982 of attempting to murder his wife, Martha (known as "Sunny"), by injecting her with insulin. (SAC ¶ 66). Sunny, the heiress to a utilities fortune, was found unconscious in the couple's home in Newport, Rhode Island, in 1980 and fell into an irreversible coma. (*Id.*). The prosecution's theory of her death was that von Bülow wanted Sunny out of the picture so that he could be with his mistress. (*Id.*).

[5]    Marriott claimed in an affidavit that he had personally delivered drugs and hypodermic syringes to Sunny and von Bülow's stepson, Alexander von Auersperg. (SAC ¶ 67). In seeking a new trial following his conviction, von Bülow's defense attorneys intended to use Marriott's affidavit in support of their arguments that Sunny had abused drugs and that von Auersperg had framed von Bülow for Sunny's death. (*Id.*).

[6]    Marriott wanted Fr. Magaldi to attest to the fact that three years prior to von Bülow's conviction, Marriott had confessed to Fr. Magaldi that he had delivered drugs, needles, and hypodermic syringes to von Auersperg at least six times in 1978 and 1979. (SAC ¶ 68). Fr. Magaldi eventually provided his own affidavit relaying the supposed details of Marriott's confessions. (*Id.* at ¶¶ 70-71). Thereafter, Fr. Magaldi was charged with perjury, and it was alleged that he and Marriott fabricated accounts of meeting von Auersperg and of Marriott's delivery of drugs to the von Bülow household. (*Id.* at ¶ 74 n.1).

Fr. Magaldi agreed to meet with von Bülow in New York City to discuss the testimony he could provide to aid von Bülow's defense. (*Id.* at ¶ 70). In turn, Plaintiff agreed to drive Fr. Magaldi to a train station in Connecticut and escort him to New York on the train. (*Id.* at ¶ 76). Defendants arranged for Fr. Magaldi and Plaintiff to stay in a two-bedroom suite at the Waldorf-Astoria. (*Id.* at ¶ 76).

Fr. Magaldi and Plaintiff met von Bülow at his New York City apartment, where they discussed von Bülow's criminal case and his offer to make a charitable donation on behalf of Fr. Magaldi. (SAC ¶ 77). Fr. Magaldi then provided a telephonic summary of the meeting to Bishop Gelineau. (*Id.* at ¶ 78). Later that evening, Fr. Magaldi and Plaintiff returned to the hotel, where Fr. Magaldi insisted that Plaintiff accompany him to a hotel lounge and provided him alcohol to drink. (*Id.* at ¶ 80). Plaintiff eventually retired to his own room in their hotel suite. (*Id.* at ¶¶ 76, 80). At dawn, Fr. Magaldi woke Plaintiff up and raped him in his hotel room. (*Id.* at ¶ 81). Later that same day, Fr. Magaldi sexually abused Plaintiff while he was taking a shower. (*Id.*).

### 4. Defendants' Role in Concealing Plaintiff's Abuse

Plaintiff contends that over a period of decades, Defendants enabled and concealed the abuse of young boys like Plaintiff, choosing to protect the reputations of abusive priests, including Fr. Magaldi, at the expense of their victims. (SAC ¶¶ 34, 92). By the 1960s and 1970s, numerous Roman Catholic bishops, including Bishop Gelineau, were on notice that priests were sexually abusing children via recurrent and predictable patterns of behavior. (*Id.* at

¶¶ 34-35).  For instance, Bishop Gelineau received several complaints from parents and children about abuse and inappropriate touching by priests within the Diocese of Providence, and yet he repeatedly failed to investigate such allegations, neglected to remove priests from positions providing them with unrestricted access to children, and continued to allow priests to take young boys on trips.  (*Id.* at ¶¶ 35-38).  More broadly, Defendants fostered the misperception that abusive clerics remained in good standing in the Diocese by, *inter alia*: (i) allowing them to lead vacation trips that included minors, without an accompanying parent, in New York and other states; (ii) continually assigning them to duties involving minors; (iii) replacing certain offending clerics in positions that involved child contact with other abusive clerics; (iv) allowing offending clerics to publicly announce explanations for leaving an assignment or position that elided their sexual abuse; (v) promoting offending clerics within the church hierarchy; (vi) privately assuring parents that issues involving sexual abuse would be "taken care of"; (vii) directing non-offending priests to confidentially report sexual abuse to Defendants; (viii) providing and subsidizing living arrangements for offending clerics after removal from their assignments; and (ix) continuing to list offending clerics in official directories with euphemisms, such as "absent on leave" or "advanced studies," that downplayed their abusive conduct.  (*Id.* at ¶ 92).

As a result of Defendants' actions, Plaintiff was lulled into a false sense of security and believed that he and his family were safe among priests, including Fr. Magaldi.  (SAC ¶ 93).  Defendants' actions further created an air

of plausible deniability that permitted them to cast aside parishioners' worries about abusive clerical conduct as isolated instances of misconduct, rather than an endemic problem. (*Id.*). Plaintiff, his family, and others relied on Defendants' representations that the Diocese of Providence's clerics were in good standing and wrongly believed they could rely on Defendants to protect them and future victims by disciplining abusive clerics. (*Id.* at ¶ 94).

## B.   Procedural Background

### 1.   The Instant Action

On September 29, 2020, Plaintiff filed the initial complaint in this action in the Supreme Court of the State of New York, County of New York. (Dkt. #4-1). On January 25, 2021, the parties stipulated that service of the summons and complaint would be effective as of the stipulation's execution date. (Dkt. #4-2). Thereafter, on February 19, 2021, Defendants noticed the removal of this action to federal court, asserting diversity jurisdiction. (Dkt. #4).

On March 1, 2021, Defendants filed a letter requesting a pre-motion conference on their anticipated motion to dismiss, which letter previewed their personal jurisdiction and *res judicata* arguments. (Dkt. #10). On March 5, 2021, Plaintiff filled a responsive letter, arguing that Defendants' proposed motion to dismiss would be premature while time remained for Plaintiff to move to remand or to amend his pleadings. (Dkt. #13). On March 8, 2021, the Court denied Defendants' request for a pre-motion conference, without prejudice to its renewal, and gave Plaintiff until March 22, 2021, to either move

9

to remand the case back to state court, file an amended complaint, or inform the Court that he would proceed with the original complaint.  (Dkt. #14).

Plaintiff filed an amended complaint on March 22, 2021.  (Dkt. #15). One week later, on March 29, 2021, Defendants renewed their request for a pre-motion conference regarding their contemplated motion to dismiss, which previewed the same personal jurisdiction and claim preclusion arguments as their previous letter.  (Dkt. #16).  Plaintiff filed a letter in response on April 1, 2021.  (Dkt. #18).  On April 6, 2021, the Court convened the initial pretrial conference in this matter, during which the Court set a briefing schedule for Defendants' motion to dismiss.  (*See* Minute Entry of April 6, 2021).  The resulting schedule included an opportunity for Plaintiff to amend his pleadings further.  (*Id.*).

On April 30, 2021, Plaintiff filed his Second Amended Complaint, which is the operative pleading in this matter.  (Dkt. #30).  Defendants filed their motion to dismiss and supporting papers on May 28, 2021.  (Dkt. #31-35). Plaintiff filed his opposition brief on June 30, 2021.  (Dkt. #38).  Defendants filed their reply papers on July 16, 2021.  (Dkt. #39).

## 2.    The Rhode Island Action[7]

Significantly, the instant case is not Plaintiff's only — or even his first — litigation concerning these issues.  One year before filing this lawsuit, on

---

[7]    On a motion to dismiss, a court may take judicial notice of related lawsuits, judicial decisions, and litigation filings.  *See Gertskis* v. *U.S. E.E.O.C.*, No. 11 Civ. 5830 (JMF), 2013 WL 1148924, at *1 (S.D.N.Y. Mar. 20, 2013) ("A district court reviewing a motion to dismiss may also consider documents of which it may take judicial notice, including

September 30, 2019, Plaintiff filed suit in Rhode Island Superior Court against Bishop Gelineau, RCB, and St. Anthony's, as well as others affiliated with the Roman Catholic Church (the "Rhode Island Action").[8]  On November 25, 2019, Plaintiff filed an Amended Complaint in the Rhode Island Action, which pleading asserted claims related to the sexual abuse and exploitation Plaintiff had endured while affiliated with St. Anthony's.  (Vita Decl., Ex. B ("Rhode Island Amended Complaint")).  In particular, Count XII of the Rhode Island Amended Complaint alleged negligence and breach of duty against Defendants and others under the New York Child Victims Act, based on Fr. Magaldi's alleged sexual abuse of Plaintiff in New York.  (*Id.* at 134-35; *see also id.* at 114 (describing visit to New York)).

The defendants in the Rhode Island Action filed a motion to dismiss on December 19, 2019.  (Vita Decl., Ex. C ("Rhode Island Motion to Dismiss")).  In their briefing on the motion, the Rhode Island defendants argued that because Rhode Island bore the "most significant relationship" to the events and parties in that suit, choice of law principles dictated that Rhode Island's statute of limitations should govern *all* of Plaintiff's claims, even those related to abuse that occurred in New York.  (*Id.* at 19 n.13).  Plaintiff filed his opposition brief

---

pleadings and prior decisions in related lawsuits."), *aff'd sub nom. Gertskis* v. *E.E.O.C.*, 594 F. App'x 719 (2d Cir. 2014) (summary order).

[8]     Defendants included a subset of documents from the Rhode Island Action as exhibits on this motion.  (*See* Vita Decl., Ex. B-G).  The Court obtained additional information related to the Rhode Island Action from the Rhode Island Judiciary Public Portal.  *See* https://publicportal.courts.ri.gov/PublicPortal.  The record numbers for the trial court and Rhode Island Supreme Court proceedings in the Rhode Island Action are "PC-2019-09894" and "SU-2021-0041-A," respectively.

in the Rhode Island Action on June 4, 2020, in which he focused principally on his claims under Rhode Island law.  (Vita Decl., Ex. D ("Plaintiff's Rhode Island Opposition")).  Plaintiff's only reference to New York law in the Rhode Island Opposition was in a footnote, which mentioned that New York had "enacted and extended a window in which such claims [relating to childhood sexual abuse] can be brought."  (*Id.* at 33 n.22).  On July 16, 2020, the Rhode Island defendants filed their reply memorandum in support of their motion to dismiss.

On August 17, 2020, Plaintiff submitted a rebuttal memorandum addressing the constitutionality of the Rhode Island statute that purported to revive certain otherwise-time-barred claims of sexual assault.  (Vita Decl., Ex. E ("Plaintiff Rebuttal Memorandum")).  In this submission, Plaintiff noted that the Rhode Island "Defendants have never developed a substantive argument in support of their position in favor of dismissal of Count XII of [Plaintiff's] complaint," which counseled in favor of denying their motion to dismiss his claims under New York law.  (*Id.* at 9-10 n.6).

On September 30, 2020, Justice Netti C. Vogel held oral argument on the Rhode Island defendants' motion to dismiss.  (Vita Decl., Ex. F ("Rhode Island Hearing")).[9]  Neither party made arguments regarding Plaintiff's New York claim at oral argument.  (*See generally id.*).  On October 16, 2020, Justice Vogel issued an opinion in the Rhode Island Action granting Defendants' motion to dismiss.  (*See* Vita Decl., Ex. G ("Rhode Island Decision")).  Of note, Justice

---

[9]     Plaintiff initiated the instant action in New York State Supreme Court on the eve of oral argument in the Rhode Island Action.

Vogel found Plaintiff's claims against Bishop Gelineau, RCB, and St. Anthony's to be time-barred because the legislative amendment that expanded Rhode Island's statute of limitations for claims based upon childhood sexual abuse applied retroactively only as to defendants deemed "perpetrators." (*Id.* at 2-3). Having found that Bishop Gelineau, RCB, and St. Anthony's were "non-perpetrators" under Rhode Island law, Justice Vogel held that the statute of limitations for Plaintiff's claims against them had run. (*Id.*). In her decision, Justice Vogel noted the existence of Plaintiff's Count XII brought under New York Law, but did not engage in a separate choice of law analysis or otherwise independently assess the New York claim. (*See id.* at 10 n.4). Justice Vogel granted the Rhode Island Defendants' motion to dismiss in its entirety. (*Id.* at 21).

On December 2, 2020, Plaintiff noticed his appeal of the Rhode Island Decision to the Rhode Island Supreme Court. On May 10, 2021, Plaintiff filed a pre-briefing statement of the case under Article I, Rule 12A(1) of the Rhode Island Supreme Court Rules of Appellate Procedure. (Def. Reply, Ex. A ("Plaintiff's Rule 12A Statement")). Foreshadowing his arguments on appeal, Plaintiff contended that Justice Vogel had "overlooked Plaintiff's New York claim," and, relatedly, that "[t]he statute of limitations under [the New York Child Victims Act] has not yet run." (*Id.* at 13). As of the date of this Opinion, Plaintiff's appeal in the Rhode Island Supreme Court remained pending.

**DISCUSSION**

**A.     Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)**

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). "A plaintiff must establish the court's jurisdiction with respect to each claim asserted[.]" *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (internal quotation marks omitted). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam) (citation omitted).

All jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993) (citation omitted). However, the court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation[.]" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d

Cir. 2013) (citations omitted); *accord Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).[10]

District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis. *First*, the court must establish whether there is "a statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). In making this determination, the court "applies the forum state's personal jurisdiction rules," unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks and citation omitted). *Second*, the court must decide whether "the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Sonera Holding B.V.* v. *Çukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (per curiam) (citation omitted).

There are "two categories of personal jurisdiction: general and specific personal jurisdiction. General, all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity. Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that aris[e] out of or relat[e] to

---

[10]     Both sides have submitted affidavits in support of their respective positions on personal jurisdiction, which the Court may consider in connection with Defendants' motion pursuant to Rule 12(b)(2). (*See* Vita Decl., Ex. A (Affidavit of Rev. Timothy D. Reilly ("Reilly Affidavit")); Pl. Ex. A (Affidavit of Philip Edwardo ("Edwardo Affidavit"))). *See Vasquez* v. *Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 245 n.1 (S.D.N.Y. 2020) ("On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials.").

the [defendant's] contacts with the forum." *Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (internal quotation marks and citations omitted). Here, Plaintiff only asserts only specific personal jurisdiction over Defendants.

## B.    The Court Lacks Personal Jurisdiction over Defendants

The Court begins — and ultimately ends — with Plaintiff's proffered bases for personal jurisdiction over Defendants.  Plaintiff identifies two sections of New York's long-arm statute as providing for specific personal jurisdiction over Defendants in this case.  (*See* Pl. Opp. 7-20).[11]  As his primary foothold for personal jurisdiction, Plaintiff relies on C.P.L.R. § 302(a)(2), which permits a court to exercise jurisdiction over a non-domiciliary who "in person or through an agent ... commits a tortious act within the state."  In Plaintiff's estimation, Fr. Magaldi's sexual abuse of Plaintiff in New York can be attributed to Defendants through principles of agency, because Fr. Magaldi travelled to New York in his official capacity and remained at all relevant times under Defendants' supervision and control.  (*Id.* at 8-16).

Plaintiff's second statutory basis for personal jurisdiction is C.P.L.R. § 302(a)(1), which permits a court to exercise personal jurisdiction "over any non-domiciliary ... who in person or through an agent ... transacts any business within the state," so long as the cause of action "aris[es] from" that

---

[11]    Under New York Law, specific personal jurisdiction is governed by New York Civil Practice Law & Rules ("C.P.L.R.") § 302(a), which empowers New York courts to exercise jurisdiction over non-domiciliaries when a plaintiff's cause of action "aris[es] from" one of four specified types of contact with New York.  *See* C.P.R.L. § 302(a)(1)-(4).  As discussed *infra*, Plaintiff invokes two of these categories of contacts in asserting personal jurisdiction over Defendants: (i) the commission of tortious acts in New York, *id.* § 302(a)(2); and (ii) the transaction of business in New York, *id.* § 302(a)(1).

transaction.  On this point, Plaintiff argues that Fr. Magaldi and Plaintiff "were on church business" in New York, because they were required to travel as part of their jobs with Defendants for the dual purpose of fundraising and discussing matters that Fr. Magaldi learned during the Sacrament of Confession.  (Pl. Opp. 1-2, 10).  Further, Plaintiff argues that because "[Fr.] Magaldi's business activity on behalf of the church was a factual cause of his presence in New York and without the direction of supervision of the Defendants, [Fr.] Magaldi would not have been able to sexually assault [Plaintiff] while in New York," Plaintiff's claims "arise out of" Defendants' business contacts with New York.  (*Id.* at 19-20).

Defendants counter that neither provision of New York's long-arm statute permits this Court to exercise personal jurisdiction over them.[12]  With respect to Section 302(a)(2), Defendants note that Plaintiff has not alleged that Defendants, themselves, committed any tortious acts in New York and argue that Fr. Magaldi was not acting as their agent when he sexually assaulted Plaintiff.  (Def. Br. 6-8).  With respect to Section 302(a)(1), Defendants claim that Plaintiff has failed to allege adequately that Defendants transacted business in New York, and thus *a fortiori* has failed to allege claims arising out of Defendants' business in the state.  (*Id.* at 9-13).  The Court agrees with Defendants that neither provision confers personal jurisdiction over Defendants.

---

[12]    Defendant also argues that personal jurisdiction may not be asserted pursuant to C.P.L.R. § 302(a)(3).  (Def. Br. 13-15).  However, Plaintiff does not claim that this provision supports personal jurisdiction over Defendants.  (*See* Pl. Opp. 1 n.4).

1.   **Fr. Magaldi's Tortious Conduct Cannot Be Attributed to Defendants for Purposes of Section 302(a)(2)**

Under Section 302(a)(2), a court may exercise personal jurisdiction over a non-domiciliary who "through an agent … commits a tortious act within the state." C.P.L.R. § 302(a)(2). In this regard, the Second Circuit has held that "a defendant's act or omission must have occurred within the State" in which a plaintiff seeks the exercise of personal jurisdiction. *See Bank Brussels Lambert*, 171 F.3d at 789-90 (internal alterations omitted); *see also Thackurdeen* v. *Duke Univ.*, 130 F. Supp. 3d 792, 803-04 (S.D.N.Y. 2015) ("In light of controlling Second Circuit precedent, the Court is required to apply the majority rule requiring the defendant to physically commit the tortious act within New York.").

Notwithstanding this requirement, jurisdiction under Section 302(a)(2) may extend to out-of-state individuals who did not themselves commit a tort in New York, but "who can be deemed responsible for such a tort based upon theories of agency or conspiracy." *LaChapelle* v. *Torres*, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014); *see also Emerald Asset Advisors, LLC* v. *Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012) ("[P]ersonal jurisdiction under Section 302(a)(2) may also be predicated on acts taken by an agent."). "Whether a defendant's representative is an 'agent' for purposes of [Section] 302(a) hinges on whether the representative acted '[i] for the benefit of and [ii] with the knowledge and consent of [the] defendant and [iii] [the defendant] exercised some control over [the agent] in the matter.'" *LaChapelle*, 1 F. Supp. 3d at 169 (quoting *Emerald Asset Advisors, LLC*, 895 F. Supp. 2d at 430); *see also CutCo Indus., Inc.* v.

18

*Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (explaining that an "agent" for purposes of C.P.L.R. Section 302(a) is a person who has "acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal" (citations omitted)).  "While the principal need not exercise absolute control over the decisions or acts of the putative agent, … a sufficient amount of control 'may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles.'"  *Maersk, Inc.* v. *Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008) (internal citation omitted) (quoting *Scholastic, Inc.* v. *Stouffer*, No. 99 Civ. 11480 (AGS), 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14, 2000)).

Here, the Court finds that, under New York law, Plaintiff has failed to allege that Fr. Magaldi either (i) acted for Defendants' benefit when he committed the tortious conduct giving rise to the action, or (ii) committed these tortious acts with Defendants' knowledge and consent.  The Court will discuss each of these pleading failures in turn.

### a.   Fr. Magaldi's Abuse of Plaintiff in New York Was Not "for the Benefit of" Defendants

Plaintiff does not dispute that Defendants were not physically present in New York when Fr. Magaldi abused him.  Rather, Plaintiff claims that "Defendants employed, managed and supervised [Fr.] Magaldi for purposes of the business trip to New York," thereby qualifying Fr. Magaldi as Defendants' agent for purposes of Section 302(a)(2).  (Pl. Opp. 10).  Plaintiff characterizes the New York trip as centering around "church business," because (i) Fr. Magaldi intended to discuss information he learned from a penitent during

19

confession, one of the seven sacraments of the Roman Catholic Church; (ii) Fr. Magaldi hoped to obtain a charitable donation from St. Anthony's as a *quid pro quo* for assisting von Bülow; and (iii) both Fr. Magaldi and Plaintiff were required to go to New York as part of their job responsibilities as Defendants' employees.  (Pl. Opp. 2-3).  Furthermore, Plaintiff alleges that Bishop Gelineau (and, by extension, RCB and St. Anthony's) were aware of and involved in the New York trip, as evidenced by Fr. Magaldi's conversations with Bishop Gelineau before and during the trip.  (Edwardo Affidavit ¶¶ 8, 11, 13; SAC ¶ 78).  As additional evidence of Defendants' involvement, Defendants paid for Fr. Magaldi and Plaintiff's accommodations in New York.  (SAC ¶ 76).

Plaintiff's argument misconstrues the standard that must be satisfied for an individual to be deemed an "agent" for purposes of Section 302(a)(2), particularly the first requirement that the purported agent act "for the benefit of" the principal.  *CutCo Indus., Inc.*, 806 F.2d at 366.  To establish that a purported agent acted "for the benefit of" a principal in this context, it is not enough that the purported agent merely engage in some activity that benefits the principal during the time the agent was in the state; rather, the purported agent's tortious act *itself* must benefit the principal in order for the principal to be deemed responsible for the tort based upon an agency theory.  *See, e.g.*, *Barbarotto Int'l Sales Corp.* v. *Tullar*, 591 N.Y.S.2d 188, 189 (2d Dep't 1992) (explaining that "[t]he activities of a representative of a nondomiciliary in New York may be attributed to it … if it requested the performance of those activities and *the activities* benefit it" (emphasis added)); *E. N.Y. Sav. Bank* v.

*Republic Realty Mortg. Corp.*, 402 N.Y.S.2d 639, 641 (2d Dep't 1978) (noting that activities of a New York agent "will be attributed to the nondomiciliary [for jurisdictional purposes] if … *those activities* benefit it" (emphasis added)); *see also Ramgoolie* v. *Ramgoolie*, No. 16 Civ. 3345 (VEC) (SN), 2016 WL 11281385, at *5 (S.D.N.Y. Dec. 20, 2016) (finding that Section 302(a)(2) could not serve as a basis for personal jurisdiction, even though a tortfeasor was defendant's agent in New York, because the agent's tortious acts were "committed for [his] own benefit," rather than defendant's), *report and recommendation adopted*, 2017 WL 564680 (S.D.N.Y. Feb. 10, 2017).  This understanding of the proper scope of analysis under Section 302(a)(2) is buttressed by the statute's plain language, which permits jurisdiction over a party who, itself, "*through an agent* … commits a tortious act."  C.P.L.R. § 302(a)(2).  A principal does not commit a tort "through an agent," where an agent engages in tortious conduct that does not benefit the principal and did not, in any way, further the principal-agent relationship.

Defendants harp on this point, emphasizing that Fr. Magaldi's sexual abuse was driven by "wholly personal motives" outside of his employment relationship with Defendants.  (Def. Br. 7-8; Def. Reply 2-3).  In so arguing, Defendants draw on the line of cases interpreting New York law to find that sexual misconduct arises from motives personal to the perpetrator and cannot be attributed to an employer's business, even when committed in an employment setting.  (*See* Def. Br. 7-8).  Such cases convince the Court that, under New York law, Fr. Magaldi's sexual abuse — however reprehensible —

21

cannot be considered to have been committed "for the benefit" of Defendants, and cannot be attributed to Defendants under Section 302(a)(2).

Defendants cite several cases on this point, of which the Court will discuss three for illustrative purposes. *First*, in *Doe* v. *Alsaud,* a female plaintiff brought suit against an individual who raped her at the Plaza Hotel, and against his employer, a Saudi company affiliated with Prince Alsaud of Saudi Arabia. 12 F. Supp. 3d 674, 676 (S.D.N.Y. 2014). The perpetrator's job responsibilities allegedly included "luring unsuspecting women to gratify the sexual pleasure of the Prince and his entourage" at the Plaza Hotel. *Id.* (internal quotation marks and citations omitted). In dismissing plaintiff's claim for vicarious liability against the perpetrator's employer, Judge Sweet reasoned that, notwithstanding the nature of the perpetrator's job responsibilities, his "own deplorable motivations [in raping the plaintiff] were not part of any conceivable duty he had to [his employer]." *Id.* at 677. Even "[i]f Plaintiff had sufficiently pleaded that [the employer] had direct knowledge of prior sexual misconduct on the part of [the perpetrator] ... that still would not give rise to *respondeat superior* liability in the absence of an allegation that the misconduct was part of any actual responsibility [the perpetrator] had to [his employer]." *Id.* at 678.

*Second*, Defendants cite *Poppel* v. *Estate of Archibald*, a case in which two patients brought suit against a pediatric endocrinologist who engaged in a decades-long pattern of sexual abuse of patients, many of whom were disabled. No. 19 Civ. 1403 (ALC), 2020 WL 2749719, at * 1 (S.D.N.Y. May 27, 2020).

Ultimately, Judge Carter rejected the plaintiffs' attempt to hold the hospital vicariously liable for the doctor's misconduct, concluding that the doctor "was acting in a personal, not a professional, capacity during the alleged misconduct." *Id.* at *5.  Much the same as Plaintiff in the instant matter, the plaintiffs in *Poppel* had argued that the doctor's abuse was "inextricably intertwined and inseparable from" his duties to his employer.  *Id.*  The court rejected this argument, citing to a New York Court of Appeals case that held that even where an employee "committed a sexual assault while engaged in his assigned duties," that conduct constituted a "depart[ure] from his duties for solely personal motives unrelated to the furtherance of the [employer's] business."  *Id.* (quoting *Judith M.* v. *Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999)).

    *Third*, Defendants cite *Powers-Barnhard* v. *Butler*, a case in which a volleyball player brought suit against several defendants, including USA Volleyball and her out-of-state volleyball club, for claims arising out of sexual, emotional, and physical abuse committed by her volleyball coach while on a team trip to New York.  No. 19 Civ. 1208 (BKS) (ATB), 2020 WL 4925333, at *1-2 (N.D.N.Y. Aug. 21, 2020).  Judge Sannes ruled that Section 302(a)(2) did not confer personal jurisdiction over USA Volleyball or the volleyball club, because even crediting the allegation that it was common knowledge among the volleyball community that plaintiff's coach was a predator, the plaintiff did not "plausibly allege that [the coach] acted for [USA Volleyball's or the club's]

benefit, with [their] consent, or that [either entity] exercised some control over [the coach] in the matter." *Id.* at *7, 10.

Caselaw makes clear "that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Ross* v. *Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998). Thus, under New York law, Fr. Magaldi's sexual abuse cannot be considered to have been "for the benefit of" the Defendants. Accordingly, the Court concludes that Fr. Magaldi was not acting as an agent for purposes of Section 302(a)(2) when he abused Plaintiff in New York.

> **b.  Fr. Magaldi Did Not Abuse Plaintiff in New York with the "Knowledge and Consent" of Defendants**

While the absence of the first element is sufficient to support a finding that Fr. Magaldi was not acting as Defendants' agent when he abused Plaintiff in New York, the Court observes that Plaintiff faces similar problems with respect to the second prong of the agency analysis, *i.e.*, "knowledge and consent." While the Second Amended Complaint alleges that Defendants knew of and consented to Fr. Magaldi's trip to New York (*see* SAC ¶¶ 20, 26, 78-79), the law requires the principal to know of and consent to the specific tortious conduct in order to be held liable for that conduct. *Doe* v. *Roman Cath. Diocese of Erie, Pa.*, No. 20 Civ. 257 (LEK) (ML), 2021 WL 5232742, at *5 (N.D.N.Y. Nov. 10, 2021) (finding the court lacked personal jurisdiction over the Roman Catholic Diocese of Erie, Pennsylvania, where plaintiff's claims stemmed from sexual abuse in New York committed by parish basketball coach). Notably, the

Second Amended Complaint includes specific allegations that Bishop Gelineau had been made aware of *other* priests' sexual misconduct involving young boys. (*See* SAC ¶ 36 (referring to a 1993 affidavit from a parishioner who claimed to have called Bishop Gelineau about her son being molested by Fr. James M. Silva); *see also id.* at ¶ 38 (referencing Bishop Gelineau's deposition testimony admitting that between 1978 and 1984, two assistant pastors had complained about Fr. William C. O'Connell's pedophilia and molestation)).  Plaintiff also imputes knowledge to "Roman Catholic Bishops in dioceses across the United States" of a rampant pattern of sexual abuse within the ranks of the Catholic church.  (*Id.* at ¶ 34).  But nowhere does Plaintiff allege that Bishop Gelineau, RCB, or St. Anthony's was specifically aware of Fr. Magaldi's abuse of Plaintiff or anyone else at the time of the trip to New York in the summer of 1983.  Accordingly, the Court cannot find that Fr. Magaldi's abuse of Plaintiff was committed "with the knowledge and consent" of Defendants.[13]

---

[13]    The Court has carefully considered the reasoning of *Love* v. *West*, in which a sister court in this District recently found personal jurisdiction pursuant to Section 302(a)(2) in analogous factual circumstances.  *See* No. 19 Civ. 10799 (ER), 2021 WL 431210, at *5 (S.D.N.Y. Feb. 8, 2021).  In *Love*, two plaintiffs brought suit in New York against the Catholic Diocese of Jackson, Mississippi, for claims stemming from abuse they had suffered at the hands of a brother affiliated with the church, who had transported the plaintiffs to New York to attend a religious summer camp.  *Id.* at *1.  In exercising specific personal jurisdiction over the Diocese, Judge Ramos held that the brother's "alleged tortious activity arose from activity that was for the benefit of and with the knowledge and consent of the Diocese, and the Diocese exercised some control over [him] in relation to the New York trip, thereby rendering [him] an agent of the Diocese for the purposes of C.P.L.R. § 302(a)(2)."  *Id.* at *4 (citing *Emerald Asset Advisors, LLC* v. *Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012)).

To be clear, this Court is unaware of the precise arguments advanced by the parties in *Love* to Judge Ramos.  However, the *Love* decision does not engage with the line of cases discussed in the text, in which "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."  *Ross* v. *Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).  Instead, *Love*

Plaintiff here is not seeking to impose vicarious liability upon Defendants for Fr. Magaldi's tortious conduct. Nevertheless, the Court views the cases explicating the principles of agency in this context as bearing on Plaintiff's current effort to locate a statutory basis on which this Court may exercise personal jurisdiction over Defendants. Because Plaintiff has not adequately pleaded that Fr. Magaldi was acting as Defendants' agent when he engaged in the tortious conduct giving rise to Plaintiff's claims, Section 302(a)(2) cannot serve as the statutory basis for this Court's personal jurisdiction over Defendants.

## 2.    Plaintiff's Claims Do Not Arise out of Any Business Conducted by Defendants in New York for Purposes of Section 302(a)(1)

The Court next addresses Plaintiff's alternative jurisdictional argument under Section 302(a)(1), which empowers a court to exercise personal jurisdiction over a defendant who "transacts any business within the state," so long as the claims against the defendant "aris[e] from" this business. C.P.L.R. § 302(a)(1). "To establish personal jurisdiction under [S]ection 302(a)(1), two requirements must be met: [i] The defendant must have transacted business

---

appears to presume that an individual's mere presence in New York "for the benefit of" a principal is sufficient to confer specific personal jurisdiction over the principal for any tort committed by the agent in New York. *See Love*, 2021 WL 431210, at \*4 (concluding that an abusive church employee was an agent for purposes of Section 302(a)(2) because "the Diocese employed, managed, and supervised [the perpetrator], and ... authorized and funded [his] travel to New York as part of his work"). As explained *supra*, the text of Section 302(a)(2) and precedent interpreting this provision leads this Court to conclude that the tortious conduct itself must be "for the benefit of" the principal in order to subject the principal to liability under an agency theory. Without any discussion as to how an employee's sexual assault in these circumstances benefitted the principal, the Court does not see the instant matter as an occasion to controvert the established precedent answering this question in the negative.

26

within the state; and [ii] the claim asserted must arise from that business activity." *Eades* v. *Kennedy, PC Law Offs.*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)).

Plaintiff contends that the same "church business" that ostensibly qualifies Fr. Magaldi as an agent for purposes of Section 302(a)(2) (*i.e.*, the discussion of information gleaned during confession and the solicitation of charitable contributions) also constitutes "transacting business" in New York. (*See* Pl. Opp. 2-3, 16-20).  And because Fr. Magaldi's "business activity on behalf of the church was a factual cause of his presence in New York and without the direction and supervision of the Defendants, [Fr.] Magaldi would not have been able to sexually assault [Plaintiff] in New York," Plaintiff argues that his claims "arise out of" this business transaction.  (*Id.* at 19-20). Defendants, on the other hand, argue that Plaintiff's allegations fail on both prongs of Section 302(a)(1) because: (i) the alleged activities of Defendants in New York do not constitute "business" under the statute; and (ii) even if they could be so classified, Plaintiff's claims relate to sexual misconduct, not Defendants' business contacts with New York.  (Def. Br. 9-13).  As discussed in the following subsections, Defendants have the better of the legal argument.

### a.   The Transaction of Business in New York

The "transacting business" prong of the Section 302(a)(1) analysis requires "purposeful activity — some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws." *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 247 (2d Cir. 2007) (quoting *McKee Elec. Co.* v. *Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967)).  The provision "does not require that the business in question be commercial in nature." *Id.* at 247 n.10 (citing *Padilla* v. *Rumsfeld*, 352 F.3d 695, 709 (2d Cir. 2003)).

"Although it is impossible to precisely fix those acts that constitute a transaction of business ... it is the quality of the defendants' New York contacts that is the primary consideration." *Fischbarg* v. *Doucet*, 9 N.Y.3d 375, 380 (2007).  In a proper case, a single act within New York will satisfy Section 302(a)(1); where that is not so, "an ongoing course of conduct or relationship in the state may." *Licci*, 673 F.3d at 62 (citations omitted).  A court is to consider the totality of the circumstances surrounding the foreign defendant's interactions with the state.  *Bank Brussels Lambert*, 171 F.3d at 787; *accord Farkas* v. *Farkas*, 830 N.Y.S.2d 220, 221 (2d Dep't 2007).

Here, Fr. Magaldi's meeting with von Bülow to discuss charitable contributions and ostensibly exculpatory evidence constitutes the totality of Defendants' proffered interactions with New York.  Defendants urge the Court to view Plaintiff's asserted contacts as falling outside the ambit of Section 302(a)(1) because they are religious or charitable in nature and thus not the kind of activities that can qualify as "business."  (Def. Br. 9-11; Def. Reply 3-4).[14]  The Court sees no reason to draw a categorical line establishing that

---

[14]     For this position, Defendants draw upon cases explicating what constitutes a "business enterprise" for purposes of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219.  (*See* Def. Br. 9-11).  For instance, in *Tony & Susan Alamo Foundation* v. *Secretary*

religious or charitable activities cannot qualify as "transacting business" for jurisdictional purposes under Section 302(a)(1). *See, e.g.*, *Sills* v. *Ronald Reagan Presidential Found., Inc.*, No. 09 Civ. 1188 (GEL), 2009 WL 1490852, *6-9 (S.D.N.Y. May 27, 2009) (finding personal jurisdiction under Section 302(a)(1) over a defendant whose "transaction of business in New York [comprised] its concerted and purposeful campaign of solicitation of charitable donations").

Defendants mount a stronger argument in attacking the quality of the forum contacts upon which Plaintiff relies. (*See* Def. Br. 11-12). Under the diocesan structure of the Roman Catholic Church, Defendants' religious activities are targeted toward the geographic area corresponding to the Diocese of Providence, which is Rhode Island, not New York. (Reilly Affidavit ¶¶ 3-5). Defendants analogize to cases in which New York courts have found contacts to be "too insubstantial" to amount to the transaction of business under Section 302(a)(1). *See Etra* v. *Matta*, 61 N.Y.2d 455, 457-59 (1984) (finding New York contacts of Massachusetts doctor who sent experimental drug to New York and

---

*of Labor*, the Supreme Court considered whether a tax-exempt religious foundation dedicated to "the promotion of Christian faith, virtue, and charity" was an "enterprise engaged in commerce," under the FLSA. 471 U.S. 290, 292-97 (1985). In holding that the foundation qualified as an FLSA "enterprise," the Supreme Court hinged its analysis on the foundation's "commercial activities, [that were] undertaken with a 'common business purpose,'" and found that the foundation's "religious character" did not place it "beyond the reach of the [FLSA]." *Id.* at 306.

The Court does not derive much guidance on the meaning of "transacting business" as it pertains to New York's long-arm statute from Defendants' cited FLSA cases. For starters, the FLSA requires that an entity must constitute an "[e]nterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 203(s), whereas Section 302(a)(1) does not expressly limit qualifying business transactions to those that are commercial in nature. The Court declines to impute such a limitation to New York's long-arm statute.

29

acted as consultant to New York doctor to be "too insubstantial" to amount to transaction of business); *see also Paterno* v. *Laser Spine Inst.*, 24 N.Y.3d 370, 375-81 (2014) (holding that surgical center's passive online advertisement viewed by consumer in New York and pre- and post-surgery contacts with consumer did not constitute transaction of business as required by Section 302(a)(1)). Just as in those cases rejecting the application of Section 302(a)(1), Defendants argue that resting jurisdiction on Fr. Magaldi's one visit to von Bülow in New York City "would set a precedent for almost limitless jurisdiction" over non-domiciliaries. *Paterno*, 24 N.Y. 3d at 279 ("We do not interpret the expanse of C.P.L.R. 302(a)(1) to be boundless in application.").

This Court similarly strains to see how Fr. Magaldi's presence in New York to assist von Bülow with his criminal case represents an act by which Defendants "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Best Van Lines, Inc.*, 490 F.3d at 242. As a general matter, the provision of testimony in criminal cases does not relate to any ordinary function of an individual or entity affiliated with the Roman Catholic Church. That said, the Court recognizes that Fr. Magaldi travelled to New York in his priestly capacity, with Defendants' knowledge, hoping to solicit a charitable contribution from von Bülow. (*See* SAC ¶¶ 2, 75-78). Given the unusual nature of Fr. Magaldi's trip, the overriding purpose of which was largely divorced from Defendants' usual operations, the Court is hesitant to conclude that Fr. Magaldi's singular meeting with von Bülow reflects Defendants' purposeful decision to "invok[e] the benefits and protections of

[New York's] laws." *Best Van Lines, Inc.*, 490 F.3d at 247; *see also D & R Glob. Selections, S.L.* v. *Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017) ("A non-domiciliary defendant transacts business in New York when on his or her own initiative[,] the non-domiciliary projects himself or herself into this state to engage in a sustained and substantial transaction of business" (internal quotation marks and citation omitted)). Put differently, the Court does not see this as "the proper case" in which "a single act within New York ... satisf[ies] the requirements of Section 302(a)(1)." *Licci*, 673 F.3d at 62.

### b.   The Nexus Between Plaintiff's Claims and Defendants' Transaction of Business in New York

Section 302(a)(1) also requires that Plaintiff's cause of action arise from Defendants' transaction of business in the state. This means that there must be "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Henderson* v. *I.N.S.*, 157 F.3d 106, 123 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Kronisch* v. *United States*, 150 F.3d 112, 130 (2d Cir. 1998)); *accord Best Van Lines, Inc.*, 490 F.3d at 249. "[T]he 'arising from' prong of [S]ection 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury. Instead, it requires a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci*, 732 F.3d at 168-69 (internal quotation marks and citation omitted). "[W]hether a plaintiff's claim arises from a defendant's New York contacts depends upon 'the nature and elements of the particular causes of action pleaded.'" *Id.* at 169

31

(internal quotation marks and citation omitted).  "[W]here at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.'"  *Id.* (internal quotation mark and citation omitted).

Even assuming that Fr. Magaldi's trip constituted Defendants' purposeful projection into New York, which it did not, it is abundantly clear that Plaintiff's claims do not "arise out" of this purported transaction.  After all, Plaintiff brings claims against Defendants for negligence, negligent training and supervision, negligent retention, breach of fiduciary duty, and intentional and negligent infliction of emotional distress, stemming from Defendants' role in Fr. Magaldi's sexual abuse of Plaintiff in New York.  (SAC ¶¶ 95-152).  Defendants' sole business connection with New York is Fr. Magaldi's meeting with von Bülow to discuss a charitable contribution and exculpatory evidence Fr. Magaldi gleaned from a penitent.  (*See* SAC ¶¶ 2, 75; *see also* Pl. Opp. 2-3).  Plaintiff's tort claims bear no connection whatsoever to Fr. Magaldi's dealings with von Bülow, inasmuch as Plaintiff does not allege any harm stemming from the priest's discussion of sensitive religious matters or solicitation of charitable contributions.  Put simply, the fact that New York was the situs of the sexual abuse is not sufficient to establish an "articulable nexus between the business transacted and the cause of action sued upon[.]"  *Sole Resort, S.A. de C.V.* v. *Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (quoting *McGowan* v. *Smith*, 52 N.Y.2d 268, 272 (1981)).  Instead, "the event giving rise to [Plaintiff's] injury" — Fr. Magaldi's sexual abuse of Plaintiff at the Waldorf

Astoria Hotel — "had, at best, a tangential relationship to any contacts [Defendants] had with New York" — the von Bülow meeting. *Id.* at 104. The Court thus concludes that Plaintiff's claims possess "such an attenuated connection to the New York activity upon which [Plaintiff] attempt[s] to premise jurisdiction that the disputes [cannot] be characterized as having 'arisen from' the New York activity. *Id.*; *cf. Johnson* v. *Ward*, 4 N.Y.3d 516, 520 (2005) ("Plaintiffs' cause of action arose out of Defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration."); *Gelfand* v. *Tanner Motor Tours, Ltd.*, 339 F.2d 317, 321-22 (2d Cir. 1964) (concluding that plaintiffs' claim arose from negligent acts committed in Arizona, and not purchase of bus tickets in New York). Accordingly, Section 302(a)(1) cannot serve as the statutory basis for this Court to exercise personal jurisdiction over Defendants.

*     *     *

"Because there is no statutory basis for personal jurisdiction over [Defendants], the Court need not reach the question of whether the exercise of jurisdiction comports with due process." *Trodale Holdings LLC* v. *Bristol Healthcare Invs., L.P.,* No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *10 (S.D.N.Y. Nov. 29, 2017); *see also NuMSP, LLC* v. *St. Etienne,* 462 F. Supp. 3d 330, 354 (S.D.N.Y. 2020) ("Because jurisdiction is lacking under New York law, the Court need not address whether it would be consistent with federal due

33

process requirements.").  This Court simply may not exercise personal jurisdiction over Defendants.[15]

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED.  Although Plaintiff has not sought leave to amend the Second Amended Complaint, the Court finds that amendment would not be appropriate in these circumstances.  Generally speaking, courts should "freely give" leave to amend," *see* Fed. R. Civ. P. 15(a); nevertheless, "leave to amend a complaint may be denied when amendment would be futile." *Nielsen* v. *Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citation omitted).  Such is the case here, where Plaintiff has already amended his pleadings twice and the Court cannot conceive how, given the nature of Plaintiff's claims, an amendment would cure the Court's lack of personal jurisdiction over

---

[15]     The Court recognizes that, in instances in which it determines that it lacks personal jurisdiction, the preferred course of action is to refrain from considering other arguments proffered by the movant.  *See, e.g.*, *Cornwell* v. *Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385-86 (S.D.N.Y. 2009) ("[A]bsent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further."); *Norex Petroleum Ltd.* v. *Access Indus., Inc.*, 540 F. Supp. 2d 438, 449 (S.D.N.Y. 2007) (stating that dismissal for lack of jurisdiction "moots, and thus terminates, all other pending motions").

The Court pauses, however, to note its skepticism that Plaintiff's action could proceed in light of the ruling in the Rhode Island Action, in which Justice Vogel dismissed Plaintiff's New York law claim predicated on the very same allegations of sexual abuse that give rise to this action.  (*See* Rhode Island Decision at 10 n.4).  If Plaintiff believes the Rhode Island Superior Court erred in dismissing his claims in that action, his recourse is to appeal that decision within the Rhode Island Court system, not file a separate suit in a different court system.  *See Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 (1981) ("A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct review and not by bringing another action upon the same cause [of action]." (quoting *Balt. S.S. Co.* v. *Phillips*, 274 U.S. 316, 325 (1927))).  Indeed, Plaintiff has done just that. (*See* Def. Reply, Ex. A (Plaintiff's Rule 12A Statement)).

Defendants.  *See, e.g.*, *Taormina* v. *Thrifty Car Rental*, No. 16 Civ. 3255 (VEC), 2016 WL 7392214, at *8 (S.D.N.Y. Dec. 21, 2016) ("Because the Plaintiff has not demonstrated personal jurisdiction, leave to amend would be futile.").

In closing, the Court wishes to make clear that this Opinion should not be read to minimize or excuse the execrable conduct detailed in the Second Amended Complaint or Defendants' alleged roles in perpetuating the same. That the Court does not possess personal jurisdiction over Defendants in this action is not reflective of the Court's perception of the gravity of Plaintiff's allegations.  The history of adolescent sexual abuse is a scourge on the Roman Catholic Church with which it must continually reckon.  But even for well-intentioned reasons, the Court may not extend its jurisdiction beyond the bounds of the law.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     January 8, 2022
           New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge